**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

PATRICIA W.,                                                   )          No. SA CV 19-1537-PLA
                                                                       )
                              Plaintiff,                      )          **MEMORANDUM OPINION AND ORDER**
                                                                       )
          v.                                                    )
                                                                       )
ANDREW M. SAUL, COMMISSIONER             )
OF SOCIAL SECURITY                               )
ADMINISTRATION,                                      )
                                                                       )
                              Defendant.                   )
_____)

I.

**PROCEEDINGS**

Patricia W.[1] ("plaintiff") filed this action on August 8, 2019, seeking review of the Commissioner's denial of her application for a period of disability and Disability Insurance Benefits ("DIB").  The parties filed Consents to proceed before a Magistrate Judge on August 28, 2019, and September 16, 2019.  Pursuant to the Court's Order, the parties filed a Joint Submission (alternatively "JS") on April 24, 2020, that addresses their positions concerning the disputed issues

_____

[1]    In the interest of protecting plaintiff's privacy, this Memorandum Opinion and Order uses plaintiff's (1) first name and last initial, and (2) year of birth in lieu of a complete birth date.  See Fed. R. Civ. P. 5.2(c)(2)(B), Local Rule 5.2-1.

1    in the case.  The Court has taken the Joint Submission under submission without oral argument.

2

3                              **II.**

4                         **BACKGROUND**

5        Plaintiff was born in 1961.  [Administrative Record ("AR") at 373.]  She has past relevant

6    work experience as a service writer (automobile service estimator).  [Id. at 31, 281.]

7        On January 19, 2016, plaintiff filed an application for a period of disability and DIB alleging

8    that she has been unable to work since January 23, 2015.  [Id. at 23; see also id. at 373-79.]  After

9    her application was denied initially, plaintiff timely filed a request for a hearing before an

10    Administrative Law Judge ("ALJ").  [Id. at 314-15.]  A hearing was held on July 16, 2018, at which

11    time plaintiff appeared represented by an attorney, and testified on her own behalf.  [Id. at 269-90.]

12    A vocational expert ("VE") also testified.  [Id. at 281-84.]  On October 18, 2018, the ALJ issued a

13    decision concluding that plaintiff was not under a disability from January 23, 2015, the alleged

14    onset date, through October 18, 2018, the date of the decision.  [Id. at 23-32.]  Plaintiff requested

15    review of the ALJ's decision by the Appeals Council.  [Id. at 367-72.]  When the Appeals Council

16    denied plaintiff's request for review on June 17, 2019 [id. at 1-5], the ALJ's decision became the

17    final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per

18    curiam) (citations omitted).  This action followed.

19

20                              **III.**

21                   **STANDARD OF REVIEW**

22        Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's

23    decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial

24    evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622

25    F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

26        "Substantial evidence . . . is 'more than a mere scintilla[,]' . . . [which] means -- and means

27    only -- 'such relevant evidence as a reasonable mind might accept as adequate to support a

28    conclusion.'"  Biestek v. Berryhill, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019) (citations

omitted); Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Revels, 874 F.3d at 654 (internal quotation marks and citation omitted).  However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)).  The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed.  626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

## A.   THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Lounsbury, 468 F.3d at 1114.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe"

impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2.  Lounsburry, 468 F.3d at 1114.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 23, 2015, the alleged onset date.[2]  [AR at 25.]  At step two, the ALJ concluded that plaintiff has the severe impairments of fibromyalgia; osteoarthritis; status-post recent total hip replacement; and degenerative disc disease of the lumbar spine.  [Id.]  He found that plaintiff's medically determinable impairment of chorioretinitis (an inflammatory eye disease), was

---

[2]    The ALJ concluded that plaintiff meets the insured status requirements of the Social Security Act through June 30, 2020.  [AR at 25.]

1    nonsevere, as the condition was stable, and plaintiff was capable of driving and doing other

2    activities requiring good vision.  [Id. at 25-26.]  He also found that her medically determinable

3    impairments of depressive disorder and anxiety disorder do not significantly limit plaintiff's ability

4    to perform basic mental work activities and, therefore, are nonsevere.  [Id. at 26.]  At step three,

5    the ALJ determined that plaintiff does not have an impairment or a combination of impairments

6    that meets or medically equals any of the impairments in the Listing.  [Id. at 27.]  The ALJ further

7    found that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as

8    defined in 20 C.F.R. § 404.1567(b),[4] as follows:

> [She] can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can
> stand and/or walk for 6 hours out of an 8-hour workday; she has no limitations with
> sitting; she can frequently kneel and squat; and she has no manipulative limitations.

11   [Id. at 28.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded

12   that plaintiff is able to perform her past relevant work as a service writer (automobile service

13   estimator).  [Id. at 31.]  Accordingly, the ALJ determined that plaintiff was not disabled at any time

14   from the alleged onset date of January 23, 2015, through October 18, 2018, the date of the

15   decision.  [Id. at 32.]

16   /

17   /

18

19                                                    **V.**

20

21        [3]   RFC is what a claimant can still do despite existing exertional and nonexertional
     limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
22   three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
     the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
23   1151 n.2 (9th Cir. 2007) (citation omitted).

24        [4]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying
     of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in
25   this category when it requires a good deal of walking or standing, or when it involves sitting most
     of the time with some pushing and pulling of arm or leg controls. To be considered capable of
26   performing a full or wide range of light work, you must have the ability to do substantially all of
     these activities. If someone can do light work, we determine that he or she can also do sedentary
27   work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for
     long periods of time."  20 C.F.R. § 404.1567(b).

28

                                                      5

**THE ALJ'S DECISION**

Plaintiff contends that the ALJ erred when he failed to properly consider the following:  (1) the period starting January 23, 2015, plaintiff's alleged onset date, continuing until July 16, 2016, two months after her left hip replacement surgery; (2) the presence of a visual impairment; (3) the presence of a mental impairment; and (4) plaintiff's subjective symptom testimony.  [JS at 4.]  As set forth below, the Court respectfully disagrees with plaintiff and affirms the decision of the ALJ.

**A.    CLOSED PERIOD OF DISABILITY**

Plaintiff contends that the ALJ failed to consider evidence of a period of disability (related to her hip impairment) that meets the 12-month durational requirement, specifically, during the period from approximately January 23, 2015 (her alleged onset date), to July 2016 (two months after her April 7, 2016, left hip replacement surgery).  [Id. at 4-5.]  In support, plaintiff states that the record reflects that her left hip impairment impacted on her ability to stand and walk for at least twelve months during that period:  (1) in November 2014, she reported hip pain that "has been worsening in the last year" [AR at 1329]; (2) x-rays in September 2015 revealed moderate osteoarthritis [id.]; (3) in September and October 2015 it was observed that she had an abnormal gait, that she complained of having hip pain for the preceding six months, that she exhibited decreased range of motion in both hips, and that she was given a referral for an injection in the left hip [id. at 1326, 1327, 1331, 1333]; (4) in March 2016, prior to surgery, she walked with a cane [id. at 1631]; and (5) immediately post-surgery she could stand with the assistance of a front-wheeled walker.  [Id. at 1748, 1821.]  She also cites to a post-surgical July 2016 internal medicine evaluation conducted by Rocely Ella-Tamayo, M.D., who noted a normal gait, and the presence of multiple joint pain, status post recent left hip replacement.  [Id. at 1922-26.]  Dr. Ella-Tamayo opined that plaintiff was able to stand and walk for six hours in an eight-hour day.  [Id. at 1926.]

Defendant responds that although it is unclear if plaintiff "is contending that she met the durational requirement for an impairment during the period from January 2015 through July 2016, and/or whether she is contending that she was disabled for a closed period during this time," both arguments fail.  [JS at 7.]  Defendant contends that the ALJ considered evidence in 2014 as well

as from plaintiff's January 2015 alleged onset date, and properly found that the evidence did not support a finding of disability during that time.  [Id. at 7-8.]  He argues that the records cited to by plaintiff do not support any greater limitations than those found by the ALJ, and notes that despite her complaints of hip pain, she also reported riding her bicycle, going to the gym, exercising 160 minutes per week at a moderate to strenuous level, and walking her dog for exercise.  [Id. at 8 (citations omitted).]  Defendant observes that as of October 2015 plaintiff was only taking non-steroidal anti-inflammatory medication for her pain, and that her doctor recommended use of a cane.  [Id. (citing AR at 29, 1319, 1325).]  In March 2016 -- shortly before her hip surgery -- it was noted that although plaintiff ambulated with a cane, her gait and posture were normal, and that she was continuing to walk for exercise.  [Id. (citing AR at 29-30, 1624, 1639).]  Defendant submits that the ALJ properly considered this time period and to the extent plaintiff had further limitations in the few months prior to her surgery and the months after, these were only temporary and lasted less than twelve months.  [Id. at 9.]

Plaintiff responds that the ALJ "never addressed the evidence that the Commissioner marshals out," and never separately considered plaintiff's RFC between January 23, 2015, and July 2016, as he was required to do "as part of the overall pursuit of a finding of disability through the date of decision."  [Id. at 9-10 (citations omitted).]  As such, she argues that the ALJ's decision "lacks the support of substantial evidence where the ALJ fails to consider a more significant degradation of function during a prior period."  [Id. at 10.]

A review of the ALJ's decision shows that he acknowledged records reflecting that plaintiff had complained of pain as early as June 2014.  [AR at 29.]  The ALJ also noted that at that time she reported she was walking her dog, riding a bike, and going to the gym two days a week; her examination showed tenderness and mild crepitus, but good range of motion of the cervical spine; she had 11 of 17 tender points, normal muscle tone, gait, and coordination; and the doctor diagnosed fibromyalgia.  [Id. at 29 (citing id. at 1452-58).]  The ALJ also reviewed November 2014 examination records, which reflected that plaintiff was negative for ANA or rheumatoid factor; took Motrin daily for her pain; exhibited tenderness throughout her joints; had 10 out of 18 tender points; had decreased range of motion of the bilateral hips; and was taking Ultram, Mobic, and

Motrin for her pain.  [Id. (citing id. at 113-115).]  He also found that plaintiff's physical findings and course of medication remained stable "throughout subsequent visits in 2015."  [Id. (citing id. at 1404-05).]  The ALJ reviewed February 2015 records related to a cardiac workup, as well as September 2015 records.  [Id. (citation omitted).]  He noted that plaintiff underwent x-ray imaging of her hips in September 2015 due to left hip pain "of about one month."  [Id. (citing id. at 1336).]  The x-rays showed "bilateral moderate hip arthritic changes but was otherwise normal."  [Id. (citing id. at 1336).]  At that time plaintiff was prescribed a cane, and in November 2015 she reported that Mobic and the cane "help[] immensely."  [Id. (citing id. at 1319).]  Plaintiff testified at the hearing that she stopped working in January or February 2016 because she started having hip pain [id. at 271-73], and the ALJ noted that plaintiff reported "she was doing fair while off work in March of 2016," and that examination reflected she ambulated with a cane, "but her gait and posture were normal and other findings were unremarkable."  [Id. at 29 (citing id. at 1623-24, 1662).]  It was also reported that plaintiff's fibromyalgia and autoimmune disorder were noted to be "well-controlled."  [Id. at 29-30 (citing id. at 1659).]  The ALJ then reviewed plaintiff's left hip replacement surgery, which was "without complications," and stated that plaintiff was noted "to be doing well while on a home physical therapy program."  [Id. at 30 (citing id. at 1847, 1870).]  Finally, as relevant to this issue, the ALJ reviewed Dr. Ella-Tamayo's July 19, 2016, consultative internal medicine evaluation, detailed above, and noted that Dr. Ella-Tamayo found that plaintiff could perform a range of light work with unrestricted sitting, frequent kneeling and squatting, and no restrictions to the upper extremities.  [Id. (citing id. at 1922-30).]  The ALJ gave "significant weight" to the opinion of Dr. Ella-Tamayo, as "generally reasonable and supported by the record as a whole."  [Id. at 31.]  He concluded that plaintiff "has not been deprived of the ability to perform work subject to the [RFC] assessed by this decision *for any 12-month period since the alleged onset date.*"  [Id. (emphasis added).]

Based on the foregoing, and contrary to plaintiff's assertion, the ALJ *did* consider plaintiff's physical status at different periods since her alleged onset date until July 2016, and specifically determined that there was no 12-month period between January 2015 and July 2016 that warranted a finding of disability.  Plaintiff does not point to any records that were inconsistent with

1   the ALJ's RFC determination during that time period.  The Court finds, therefore, that the ALJ

2   properly considered the entire relevant period in finding that plaintiff was not disabled.

3          Remand is not warranted on this issue.

4

5   **B.     THE ALJ'S STEP TWO FINDINGS**

6          **1.     Legal Standard**

7          At step two of the five-step process, plaintiff has the burden to provide evidence of a

8   medically determinable physical or mental impairment that is severe and that has lasted or can

9   be expected to last for a continuous period of at least twelve months.  Ukolov v. Barnhart, 420

10  F.3d 1002, 1004-05 (9th Cir. 2005) (citing 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D)); see 20 C.F.R.

11  §§ 404.1508 (effective through March 26, 2017), 404.1509, 404.1520(a)(4)(ii); see generally

12  Bowen v. Yuckert, 482 U.S. 137, 148, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987) (Secretary may

13  deny Social Security disability benefits at step two if claimant does not present evidence of a

14  "medically severe impairment").  This must be "established by medical evidence consisting of

15  signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."

16  20 C.F.R. § 404.1508 (effective through March 26, 2017).  The Commissioner's regulations define

17  "symptoms" as a claimant's own description of her physical or mental impairment.  20 C.F.R. §

18  404.1528 (effective through March 26, 2017).  "Signs," by contrast, "are anatomical, physiological,

19  or psychological abnormalities which can be observed, apart from [the claimant's] statements . .

20  . [,] [and] must be shown by medically acceptable clinical diagnostic techniques."  Id.  Finally,

21  "[l]aboratory findings are anatomical, physiological, or psychological phenomena which can be

22  shown by the use of medically acceptable laboratory diagnostic techniques."  Id.  A claimant's

23  statements about an impairment (i.e., "symptoms") "are not enough [by themselves] to establish

24  that there is a physical or mental impairment."  Id.

25

26          **2.     Plaintiff's Vision Impairment**

27          The ALJ determined that plaintiff's vision impairment of chorioretinitis was non-severe.  [AR

28  at 25-26.]  Plaintiff acknowledges that on examination in September 2016 she was described as

having 20/30 vision in her left eye and 20/20 in her right eye, with correction.  [JS at 10.]  She asserts, however, that the ALJ failed to discuss the loss of visual fields in her left eye, specifically that she has "lost more than half of the visual field in the left lower quadrant, the entire right lower quadrant, and more than half of the right upper quadrant."[5]  [Id. (citing AR at 1935).]  She contends that the occupation of "an automobile-repair-service estimator requires frequent depth perception," and that while "field of vision is not required, no evidence suggests that a person with half of the visual field in one eye could manage the depth perception required of an automobile-repair-service estimator as described by the DOT [Dictionary of Occupational Titles]."  [Id. at 11 (citing DOT No. 620.261-018).]

The problem with plaintiff's argument is exactly as plaintiff states -- the DOT specifically states that "Field of Vision" is "Not Present -- Activity or condition does not exist," with respect to the aptitudes necessary for performing the duties required of an automobile-repair-service estimator.  DOT No. 620.261-018.  Although Depth Perception is an aptitude that is necessary "Frequently" for that occupation, plaintiff provides no evidence that a reduced field of vision in one eye affects an individual's depth perception.  The ophthalmologist who conducted the September 2016 testing of plaintiff's visual fields did not report any issues with depth perception resulting from plaintiff's field of vision issue.  [AR at 1933-38.]  Neither did Dr. Ella-Tamayo (who tested plaintiff's visual acuity) nor Dr. Sohn (who reviewed the record on September 26, 2016), assess any functional limitations due to a vision impairment, and Dr. Sohn actually opined that plaintiff had "no visual limitations."  [Id. at 303.]  Moreover, plaintiff's September 2016 vision examination reflected a "stable Humphrey visual field test" (which measures the entire area of peripheral vision), and noted that plaintiff was "Doing well from Azoor [acute zonal occult outer retinopathy] standpoint"; and an April 2018 record also stated "NO CHANGE" with respect to plaintiff's Humphrey Visual Field, and noted the results at that time were consistent with her April 29, 2015, results [see id. at 1342].  [Id. at 2256.]  That April 2018 record also mentioned that the provider had "reassured

_____

[5]    Plaintiff notes that the record "appears to have transposed the references to the right and left eye."  [JS at 10 n.2 (citing AR at 1935).]

1   patient that Humphrey Visual Field . . . had not changed" [id. at 2255 (emphasis omitted)],

2   although her visual acuity had changed since her last visit, "making reading more difficult."  [Id.

3   at 2256 (emphasis omitted).]

4        Based on the foregoing, the ALJ properly considered plaintiff's visual impairment and

5   substantial evidence supported his finding that it did not require any additional functional

6   limitations.  Remand is not warranted on this issue.

7

8        **3.    Plaintiff's Mental Impairment**

9        The ALJ determined that plaintiff's medically determinable impairments of depressive

10  disorder and anxiety disorder were non-severe.  [Id. at 25.]  Plaintiff argues that whether a mental

11  impairment is severe or non-severe, the ALJ must still consider the non-severe mental impairment

12  in assessing the question of disability.  [JS at 14-15.]  She states that the "question of *severe*

13  focuses on basic work activities" and states that the ALJ repeated that standard, but asserts that

14  "[w]orking as an automobile-repair-service estimator is not a 'basic work activity.'"  [Id. at 15

15  (emphasis in original) (citations omitted).]  In support, plaintiff states that the occupation "requires

16  the temperaments for making judgments and decisions and performing a variety of duties," and

17  that the "entire point of the automobile-repair-service estimator is customer service, leaving the

18  customer seeking automotive repairs satisfied and desirous of repeating as a customer."  [Id. at

19  16.]  Plaintiff suggests that "[w]hether a person could successfully perform that work to the bona

20  fide occupational qualifications of a reasonable employer while mildly impaired in every aspect of

21  mental functioning of work that requires over two years and up to and including four years of

22  vocational preparation is an unanswered question."  [Id. (citing Hutton v. Astrue, 491 F. App'x 850

23  (9th Cir. 2012) (finding error where the ALJ found mild limitations in concentration, persistence and

24  pace based on the claimant's PTSD and then disregarded his own findings).]

25        Defendant asserts that instead of contesting the ALJ's findings of only mild limitations in

26  the four areas of mental functioning (understanding, remembering, or applying information;

27  interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing

28  oneself), plaintiff "appears to contend that, despite these mild limitations, she had some

unspecified functional limitations which prevented her from performing her past relevant work," but points to no specific evidence supporting her contention that the ALJ should have included mental functional limitations in his RFC determination.  [Id. at 19.]  Defendant states that in Hutton, the ALJ discredited the claimant's testimony, his treating physician's opinions, and his VA rating; mischaracterized the claimant's testimony; and excluded the claimant's mental impairment of PTSD from consideration in determining the RFC, whereas in this case, the ALJ properly considered plaintiff's mental impairments in determining plaintiff's RFC but found that no mental functional limitations were warranted.  [Id. (citing AR at 26-28).]

In response, plaintiff concedes that the ALJ's findings of mild limitations in the four areas of mental functioning are supported by substantial evidence, but asserts that the question is "whether a person with mild or slight impairments could engage in the customer service required of an automobile-repair-service estimator."  [Id. at 20.]  Plaintiff submits that the ALJ in this case "violated the requirement to consider [plaintiff's] non-severe impairment throughout the sequential evaluation process."  [Id. (citation omitted).]

Here, the ALJ reviewed plaintiff's history of depression and anxiety.  [AR at 26.]  He noted that her hearing testimony reflected that her functional limitations were largely due to her physical impairments "as she noted few to no psychiatric or cognitive issues."  [Id.]  The ALJ noted that in 2013 plaintiff was prescribed Celexa and Xanax as needed for anxiety, but plaintiff did not need the Xanax daily and had no panic attacks.  [Id (citing id. at 1395.]  In February 2015, plaintiff was "observed in the hospital for stress/anxiety and palpitations."  [Id. at 1329.]  At that time she denied depression, stated she has "some anxiety intermittently," and that she did not feel that she needed to see a psychiatrist, but agreed to see a therapist; and noted that she was off work on disability for 90 days due to her optical inflammation.  [Id. at 1396.]  Her mental status examination was normal.  [Id. at 1396-97.]  A March 2015 mental status examination also was normal, and plaintiff reported that her mood was "doing better" [id. at 1366]; in March 2016, plaintiff stated that she was staying in bed because she did not want to "deal with the pain," and that she "can't wait to get this surgery done."  [Id. at 1623.]  She also reported that she "[d]oes not feel it's true depression as she does enjoy when she is able to do things," and reported that she "had a good time at [her]

stepson's wedding that weekend." [Id.]  With respect to her mood, she stated that she was "in pain and that has me funked up." [Id. at 1624.]  In all other respects, plaintiff's mental status examination was normal.  [Id.]

The ALJ gave great weight to the opinions of consultative psychiatrist Sohini P. Parikh, M.D., and the State agency psychologist H. Barrons, Psy.D.  [Id. at 300.]  In the July 16, 2016, complete psychiatric evaluation conducted by Dr. Parikh, she indicated plaintiff had "mild mental difficulties in maintaining social functioning," and was "mildly impaired" in responding to coworkers, supervisors, and the general public.  [Id. at 1918-19.]  Dr. Parikh diagnosed anxiety disorder NOS, depressive disorder NOS, and "[m]ood disorder due to medical condition."  [Id. at 1918.]  She opined that "from a psychiatric standpoint, [plaintiff's] prognosis is expected to improve if her medical condition improves."  [Id.]  On August 23, 2016, Dr. Barrons reviewed the record and noted Dr. Parikh's report indicating that although plaintiff reported a depressed/anxious mood, her "affect was brighter."  [Id. at 300.]  He concluded that the record of plaintiff's mental health "suggests no more than mild signs/symptoms," that plaintiff "stopped working due to medical problems," and that the record reflects "no significant limitations."  [Id.]  He determined plaintiff's mental impairment, therefore, was non-severe.  [Id. at 301.]

The ALJ also noted that in 2016 plaintiff's depressive order was noted to be "well controlled"; in 2017 and 2018 she was noted to have normal mood and affect during her various medical visits; and that the record reflects "no history of psychiatric decompensations requiring inpatient treatment or frequent adjustment of psychotropic medications." [Id. at 27.]  He concluded that "[t]here is little in the objective evidence to find that [plaintiff] has significant work-related mental or cognitive limitations," that the record reflects "no more than mild functional limitations," and that plaintiff has an "adequate range of activities of daily living and social functioning that was limited largely due to physical pain," and a "routine and conservative course of mental health treatment to date."  [Id.]

Plaintiff generally describes the duties required in her past relevant work as a service estimator to include meeting people who bring their cars into the service department and then

1  writing up their service needs.[6]  [Id. at 272; see also id. at 433 ("Meet customers, inspect, drive

2  car, write up order, move cars").]  She does not provide the Court with any evidence suggesting

3  how her admittedly mild impairment in interacting with others (or any of her other mild impairments

4  in mental functioning) would in some way interfere with her ability to perform her past relevant

5  work as an automobile service estimator.  No provider -- treating, examining, or otherwise --

6  suggested any specific mental functional limitations resulting from plaintiff's mild limitation in her

7  ability to interact with others, including the general public.  In short, the ALJ's RFC determination

8  was supported by substantial evidence.  Remand is not warranted on this issue.

9

10  **C.    SUBJECTIVE SYMPTOM TESTIMONY**

11        **1.    Legal Standard**

12        Prior to the ALJ's assessment in this case, Social Security Ruling ("SSR")[7] 16-3p went into

13  effect.  See SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).[8]  SSR 16-3p supersedes SSR 96-7p,

14  the previous policy governing the evaluation of subjective symptoms.  SSR 16-3p, 2017 WL

15  5180304, at *2.  SSR 16-3p indicates that "we are eliminating the use of the term 'credibility' from

16  our sub-regulatory policy, as our regulations do not use this term."  Id.  Moreover, "[i]n doing so,

17  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

18        [6]    Of note, the DOT job description for this occupation indicates that "Speaking-Signalling"
     people is "Not Significant."

19

20        [7]    "SSRs do not have the force of law.  However, because they represent the Commissioner's
     interpretation of the agency's regulations, we give them some deference.  We will not defer to SSRs
21   if they are inconsistent with the statute or regulations."  Holohan v. Massanari, 246 F.3d 1195, 1202
     n.1 (9th Cir. 2001) (citations omitted).

22        [8]    SSR 16-3p, originally "effective" on March 28, 2016, was republished on October 25, 2017,
23   with the revision indicating that SSR 16-3p was "applicable [rather than effective] on March 28,
     2016."  See 82 Fed. Reg. 49462, 49468 & n.27, 2017 WL 4790249, 4790249 (Oct. 25, 2017); SSR
24   16-3p, 2017 WL 5180304 (Oct. 25, 2017).  Other than also updating "citations to reflect [other]
     revised regulations that became effective on March 27, 2017," the Administration stated that SSR
25   16-3p "is otherwise unchanged, and provides guidance about how we evaluate statements
     regarding the intensity, persistence, and limiting effects of symptoms in disability claims . . . ."  Id.
26   The Ninth Circuit recently noted that SSR 16-3p is consistent with its prior precedent.  Trevizo v.
     Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (SSR 16-3p "makes clear what [Ninth Circuit]
27   precedent already required").  Thus, while SSR 16-3p eliminated the use of the term "credibility,"
28   case law using that term is still instructive in the Court's analysis.

1   we clarify that subjective symptom evaluation is not an examination of an individual's character[;]

2   [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation." Id.;

3   Trevizo, 871 F.3d at 678 n.5.  Thus, the adjudicator "will not assess an individual's overall

4   character or truthfulness in the manner typically used during an adversarial court litigation.  The

5   focus of the evaluation of an individual's symptoms should not be to determine whether he or she

6   is a truthful person."  SSR 16-3p, 2017 WL 5180304, at *11.  The ALJ is instructed to "consider

7   all of the evidence in an individual's record," "to determine how symptoms limit ability to perform

8   work-related activities."  Id. at *2.  The Ninth Circuit also noted that SSR 16-3p "makes clear what

9   our precedent already required:  that assessments of an individual's testimony by an ALJ are

10  designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the

11  individual has a medically determinable impairment(s) that could reasonably be expected to

12  produce those symptoms,' and 'not to delve into wide-ranging scrutiny of the claimant's character

13  and apparent truthfulness.'"  Trevizo, 871 F.3d at 678 n.5 (citing SSR 16-3p).

14          To determine the extent to which a claimant's symptom testimony must be credited, the

15  Ninth Circuit has "established a two-step analysis."  Trevizo, 871 F.3d at 678 (citing Garrison, 759

16  F.3d at 1014-15).  "First, the ALJ must determine whether the claimant has presented objective

17  medical evidence of an underlying impairment which could reasonably be expected to produce the

18  pain or other symptoms alleged."  Id. (quoting Garrison, 759 F.3d at 1014-15); Treichler v. Comm'r

19  of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d

20  1028, 1036 (9th Cir. 2007)) (internal quotation marks omitted).  If the claimant meets the first test,

21  and the ALJ does not make a "finding of malingering based on affirmative evidence thereof"

22  (Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)), the ALJ must "evaluate the

23  intensity and persistence of [the] individual's symptoms . . . and determine the extent to which

24  [those] symptoms limit [her] . . . ability to perform work-related activities . . . ."  SSR 16-3p, 2017

25  WL 5180304, at *4.  In assessing the intensity and persistence of symptoms, the ALJ must

26  consider a claimant's daily activities; the location, duration, frequency, and intensity of the pain or

27  other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side

28  effects of medication taken to alleviate pain or other symptoms; treatment, other than medication

1    received for relief of pain or other symptoms; any other measures used to relieve pain or other

2    symptoms; and other factors concerning a claimant's functional limitations and restrictions due to

3    pain or other symptoms. 20 C.F.R. § 416.929; see also Smolen v. Chater, 80 F.3d 1273, 1283-84

4    & n.8; SSR 16-3p, 2017 WL 5180304, at *4  ("[The Commissioner] examine[s] the entire case

5    record, including the objective medical evidence; an individual's statements . . . ; statements and

6    other information provided by medical sources and other persons; and any other relevant evidence

7    in the individual's case record.").

8        Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ

9    did not make a finding of malingering, the ALJ's reasons for rejecting a claimant's subjective

10   symptom statements must be specific, clear and convincing.  Brown-Hunter v. Colvin, 806 F.3d

11   487, 488-89 (9th Cir. 2015); Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (citing Molina

12   v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)); Trevizo, 871 F.3d at 678 (citing Garrison, 759

13   F.3d at 1014-15); Treichler, 775 F.3d at 1102.  "General findings [regarding a claimant's credibility]

14   are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence

15   undermines the claimant's complaints."  Burrell, 775 F.3d at 1138 (quoting Lester, 81 F.3d at 834)

16   (quotation marks omitted).  The ALJ's findings "'must be sufficiently specific to allow a reviewing

17   court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and

18   did not arbitrarily discredit a claimant's testimony regarding pain.'"  Brown-Hunter, 806 F.3d at 493

19   (quoting Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)).  A "reviewing court

20   should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's

21   allegations of disabling pain."  Bunnell, 947 F.2d at 346.  As such, an "implicit" finding that a

22   plaintiff's testimony is not credible is insufficient.  Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir.

23   1990) (per curiam).

24

25       **2.    The ALJ's Decision**

26       The ALJ summarized plaintiff's and her husband's testimony and stated that their

27   "statements concerning the intensity, persistence and limiting effects of these symptoms are not

28   entirely consistent with the medical evidence and other evidence in the record . . . ."  [AR at 28-

29.] The ALJ then detailed plaintiff's history of treatment for joint and muscle pain and noted the

following: plaintiff's "wide range of activities of daily living; her physical examination results from

November 2014 through 2017; her generally conservative treatment (other than the April 2016 hip

surgery); her statement in late 2016 reporting 75% improvement in her left hip after surgery; an

injection she received for her shoulder in October 2016, and a referral to orthopedics for a left hip

injection [see id. at 1946], although there is no indication she ever received such an injection; pain

in plaintiff's left shoulder again in January 2017 and plaintiff's request for another left shoulder

injection as she was "planning on going to NY"; in April 2017 plaintiff reported that the January

2017 injection relieved her left shoulder pain; other 2017 reports showed "intermittent flare-ups

of pain to the upper extremities" treated with Percocet, but plaintiff denied weakness and her

physical examination was unremarkable for motor deficits; stable examination findings in 2017;

in July 2017 plaintiff reported pain in her left knee on weightbearing and an x-ray showed

"patellofemoral OA [osteoarthritis] but otherwise no significant OA in the joint itself"; in July 2017

she reported her back and hips are "ok" but her left wrist had been "aching"; in October 2017 she

received an injection for her left knee and stated she was "in pain everywhere" as she had been

"busy with moving"; in January 2018 she reported "improved boot and foot pain" as well as

improvement of left knee pain after undergoing the October injection; also in January 2018 she

reported bilateral hand pain, left greater than right, starting in November 2017, and x-rays of the

left hand indicated osteoarthritis and osteophytes at the "basal and scaphe joint," for which she

received injections for her carpometacarpal joints bilaterally. [Id. at 30-31 (citing id. at 2209-16).]

An examination on January 23, 2018, reflected tenderness to palpation over multiple joints and

limited range of motion of the hips, but no gait or motor deficits, and 4/18 tender points, and

plaintiff was given an injection in the joint of her finger. [Id. at 2212-24, 2218.] She was told to

return in about four months. [Id. at 2219.]

The ALJ also noted the following:

Aside from her successful left hip replacement surgery, the record otherwise does
not show further diagnostic workups or surgical intervention for [plaintiff's]
musculoskeletal issues. There is also limited evidence of targeted physical therapy
or long-term pain management of [her] symptoms. As a whole the evidence
conveys that [she] had pain flare-ups at times, but generally achieved symptom

stability based on the longitudinal examination findings and generally conservative treatment to date.  There are no diagnostic or examination findings to suggest that [her] use of an assistive device such as a cane is medically necessary, or that she had significant upper extremity weakness to warrant only sedentary activities.  There is little in the objective record to suggest that [plaintiff] is unable to perform the range of light work as set forth in this Finding.

[Id. at 31.]

### 3.    The Parties' Contentions

Plaintiff notes that in her February 29, 2016, Adult Function Report, she reported "an inability to sit, stand, walk, or lie down for extended periods of time because of constant pain and an inability to focus on even simple tasks"; she can attend to personal hygiene and bathing but only if the activities do not involve a lot of standing "and even then slowly"; she relies on her husband and son to care for pets; she can prepare meals if they are simple "ready-to-eat or heat and eat"; she can load the dishwasher and use a microwave; and she has difficulty handling money because of vision problems.  [JS at 21 (citing AR at 422-26).]  Plaintiff contends that the ALJ did not point to any evidence to "resolve the discrepancy between an inability to engage in prolonged standing and walking, frequent manipulation, or prolonged attention and concentration to skilled tasks."  [Id. at 24 (citing Garrison, 759 F.3d at 1020).]  She argues, therefore, that the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's subjective symptom testimony.  [Id. at 20.]

Defendant responds that the ALJ properly evaluated plaintiff's subjective symptom testimony.  [Id. at 26.]  He notes that the ALJ first considered the consistency of plaintiff's statements about her symptoms with the objective medical evidence, which revealed minimal findings; found that the medical opinions of Dr. Ella-Tamayo, Dr. Parikh, and Dr. Barrons did not support plaintiff's testimony; found plaintiff's daily activities were inconsistent with her allegations of disabling impairments; and found that plaintiff reported improvement with treatment.  [Id. at 26-29 (citations omitted).]

Plaintiff responds that two months post-surgery Dr. Ella-Tamayo found "mild pain" in plaintiff's left hip and noted multiple joint pains; in October 2016 plaintiff had decreased range of

motion in the bilateral hips and treatment included injection therapy[9]; in February 2017 it was recommended she use adaptive equipment[10]; in July 2017 she reported that her hip was "ok" although she still had decreased range of motion; and in December 2017 a CT scan for gastrointestinal distress reflected that she had developed moderate lower lumbar spondylosis, and grade 1-2 degenerative anterolisthesis at L5/S1 was also noted.  [Id. (citing AR at 1924, 1926, 1942, 1946, 2025, 2074, 2129).]  Plaintiff submits that "the record as a whole correlates with [her] symptoms and limitations sufficiently to make [the ALJ's] articulation lacking in the support of substantial evidence."  [Id. at 32.]

### 4. Analysis

Plaintiff's subjective symptom allegations were set forth, in part, in her February 2015 Adult Function Report.  [AR at 422-30.]  Indeed, her reported activities reflected that the activities she was able to engage in -- such as some cooking, shopping, and house and yard work -- were all done at a much slower pace and kept simple, without a lot of standing, due to her pain and resulting fatigue.  [Id.]  In that report, she also mentioned her vision issues, and stated that she often needed help reading labels, among other things.  The Court has already addressed -- and rejected -- plaintiff's arguments regarding the ALJ's findings regarding plaintiff's vision problem, and his purported failure to find a closed period of disability between January 2015 and April 2016.  Therefore, to the extent these subjective symptom allegations relate to those issues, there was no error.

Plaintiff's hearing testimony [id. at 271-81] also reiterates much of the same pre-surgery information, while adding only a bit more post-surgical information.  For instance, she stated at the

---

9    As previously discussed above, in October 2016 a referral to orthopedics for a left hip injection was noted but there is no evidence that plaintiff ever received that injection.  [AR at 1946.]

10    In support of this proposition, plaintiff points to what appears to be a list of "Patient Education" documents available at Kaiser Permanente for patients who have had a hip replacement.  [See JS at 32 (citing to AR at 2025).]  There is no indication that adaptive equipment had actually been recommended for plaintiff's continued use.

hearing that she stopped working in January or February 2016 because of her hip pain; she cannot engage in work activity "mostly from" her arthritis, with pain in her shoulders, wrists, hip, and back; she can comfortably lift 10 pounds; she relies on her son to help with grocery shopping; her brother does the yard work; and she has blind spots in her right eye "without blurring or actual blindness," making it difficult for her to read such things as a vehicle VIN number. [Id. at 273-78.] Plaintiff mentioned that she used to do a lot of bike riding and paddle boarding, but does not "do a lot of stuff anymore." [Id. at 275.] She also testified that the daily pain in her wrists is about a 2-3 on a 10-point scale, and she tries not to do much or the pain will go up. [Id. at 277.] She admitted that after her hip surgery, the pain in the hip area had improved, but that sometimes she feels that "it gets stiff." [Id.] She described her vision as changing daily and stated that there are some days she sees clearly, and some days she can hardly focus or see anything. [Id. at 278.] Because of her vision issue, she stated that she has to be careful when she walks so that she does not knock things over or trip and fall. [Id. at 278-79.] Finally, she stated that she has bad days a couple of times a week and that on a bad day, her "goal for the day would be brushing my teeth and washing my face before my husband gets home to kind of look alive." [Id. at 270-80.]

Plaintiff does not dispute defendant's characterization that in discounting plaintiff's subjective symptom testimony, the ALJ relied on the fact that her statements were not consistent with the objective evidence; that her testimony was not supported by the medical opinions of Dr. Ella-Tamayo, Dr. Parikh, and Dr. Barrons; that her daily activities were inconsistent with her allegations of disabling impairments; and that she reported improvement with treatment. [See, e.g., JS at 26-29 (citations omitted).] Although plaintiff argues that there was a discrepancy between the record and her alleged inability to engage in prolonged standing and walking, there is nothing in the record to support those allegations even two months post-surgery when Dr. Ella-Tamayo conducted her physical examination. Moreover, as previously discussed, although plaintiff now suggests that she has an inability to maintain prolonged attention and concentration to skilled tasks, the Court has previously discussed the ALJ's determination that any mental limitations demonstrated by the record were mild, and rejected plaintiff's argument that the ALJ failed to properly consider her mental impairments. Finally, plaintiff now argues that she has an

1   inability to engage in "frequent manipulation," which is not only unsupported by the record, but also

2   not supported by her testimony, which suggested that at the time of the hearing, the pain in her

3   wrists was about 2-3 on a 10 point scale.  [AR at 277.]

4          In this case, the ALJ properly determined that plaintiff's subjective symptom testimony was

5   inconsistent with the objective medical evidence.  While a lack of objective medical evidence

6   supporting a plaintiff's subjective complaints cannot provide the only basis to reject a claimant's

7   subjective symptom testimony (Trevizo, 871 F.3d at 679 (quoting Robbins, 466 F.3d at 883)), it

8   is one factor that an ALJ can consider in evaluating symptom testimony.  See Burch v. Barnhart,

9   400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis

10  for discounting pain testimony, it is a factor the ALJ must consider in his credibility analysis."); SSR

11  16-3p, 2017 WL 5180304, at *5 ("objective medical evidence is a useful indicator to help make

12  reasonable conclusions about the intensity and persistence of symptoms, including the effects

13  those symptoms may have on the ability to perform work-related activities for an adult").  "The

14  intensity, persistence, and limiting effects of many symptoms can be clinically observed and

15  recorded in the medical evidence.  . . . These findings may be consistent with an individual's

16  statements about symptoms and their functional effects.  However, when the results of tests are

17  not consistent with other evidence in the record, they may be less supportive of an individual's

18  statements about pain or other symptoms than test results and statements that are consistent with

19  other evidence in the record."  SSR 16-3p, 2017 WL 5180304, at *5.  As the Ninth Circuit recently

20  held, "an ALJ's 'vague allegation' that a claimant's testimony is 'not consistent with the objective

21  medical evidence,' without any 'specific finding in support' of that conclusion, is insufficient."

22  Treichler, 775 F.3d at 1103 (citation omitted); see Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th

23  Cir. 2017) (ALJ's statement that plaintiff's testimony regarding the intensity, persistence, and

24  limiting effects of his symptoms was not credible to the extent his testimony is "inconsistent with

25  the above residual functional capacity assessment" is an insufficient basis for discrediting

26  testimony).  Here, this was a specific, clear and convincing reason for discounting plaintiff's

27  subjective symptom testimony.  Nevertheless, the ALJ's determination to discount plaintiff's

28  subjective symptom testimony as inconsistent with the objective medical evidence rises or falls

1   with the ALJ's other grounds for discrediting plaintiff.

2          The ALJ also determined that other evidence did not support plaintiff's testimony.  "Other

3   evidence" may include the claimant's daily activities, medications, other measures used to

4   alleviate symptoms, and any other factors the ALJ deems relevant.  See 20 C.F.R. §§

5   416.929(c)(3)(i)-(vii).  In this case, the ALJ relied on the facts that other than her left hip surgery,

6   plaintiff received no further diagnostic workups or surgical intervention for her musculoskeletal

7   issues; there is limited evidence of targeted physical therapy or long-term pain management of

8   plaintiff's symptoms; plaintiff's daily activities were inconsistent with her allegations; and the

9   evidence conveys that plaintiff had pain flare-ups at times, but generally achieved symptom

10  stability based on the longitudinal examination findings and generally conservative treatment to

11  date.

12         The ALJ properly relied on the fact that despite her allegations of disabling pain, plaintiff

13  generally received only conservative treatment for her impairments.  Johnson v. Shalala, 60 F.3d

14  1428, 1432 (9th Cir. 1995).  "Conservative treatment" has been characterized by the Ninth Circuit

15  as, for example, "treat[ment] with an over-the-counter pain medication" (see, e.g., Parra v. Astrue,

16  481 F.3d 742, 751 (9th Cir. 2007); Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008)

17  (holding that the ALJ properly considered the plaintiff's use of "conservative treatment including

18  physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve

19  stimulation unit, and a lumbosacral corset")), or a physician's failure "to prescribe . . . any serious

20  medical treatment for [a claimant's] supposedly excruciating pain."  Meanel v. Apfel, 172 F.3d

21  1111, 1114 (9th Cir. 1999).  Although in this case plaintiff underwent left hip surgery, she was

22  nevertheless able to work until four months before that surgery, and in July 2016 --  two months

23  post-surgery -- the consultative examiner observed that plaintiff walked with a normal gait.  [AR

24  at 1925.]  Even though plaintiff reported multiple joint pain to the consultative examiner, the

25  examination itself was generally normal, with range of motion within normal limits; no deformity,

26  tenderness or spasm in the neck; no inflammation or tenderness in the upper extremities; normal

27  joints on the lower extremities and only mild pain in the left hip, with no varicosities, calf

28  tenderness, or pedal edema; deep tendon reflexes at 1+ bilaterally; and motor strength 5/5

symmetrically.  [Id. at 1925-26.]  The consultative examiner opined that plaintiff was capable of a range of light work as follows:  able to lift and carry about 20 pounds occasionally and 10 pounds frequently; unrestricted sitting; and able to stand and walk for 6 hours in an 8-hour day.  [Id. at 1926.]

Moreover, although plaintiff received left shoulder injections in October 2016 and January 2017, those injections provided relief (indeed, plaintiff requested the January 2017 injection because of the relief she received from the October 2016 injection until a "rainy spell" exacerbated her shoulder pain).  [Id. at 2209-10.]  She also received a left knee injection in October 2017, and a hand injection in January 2018 -- both of which also provided relief.  [Id. at 2210.]  Moreover, between January 2017 and January 2018, although plaintiff complained of various aches and pains at each visit, her subsequent visits (usually about three months later) reflected that the previously-treated aches and pains were generally better.  [See id.]  This record lends support to the ALJ's finding that plaintiff had occasional flareups of her symptoms, which were treated at the time she complained of them, and for which the treatment provided relief.

Additionally, plaintiff's testimony at the hearing reflected that the pain in her wrists was about 2-3 on a 10 point scale, and her hip pain improved after surgery.  [Id. at 277.]  Although she stated at the hearing that she was still having pain in the hip area, she described it as "a catchy thing I can feel it, I think when it gets swollen I can feel it, it gets stiff."  [Id. at 277.]  Plaintiff's allegations of otherwise disabling symptoms simply was not supported by this testimony or by any records reflecting disabling pain lasting a twelve-month period.

The Court acknowledges -- as did the ALJ -- that plaintiff does have occasional flareups of her symptoms for which she has sometimes received an injection and for which she is prescribed medication or other treatment.  The Court finds, however, that the ALJ provided clear and convincing reasons supported by substantial evidence to discount plaintiff's testimony.

Remand is not warranted on this issue.

/

/

/

## VI.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **denied**; and (2) the decision of the Commissioner is **affirmed**.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  May 18, 2020

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE